J8UQgerH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA
3
                v.                          17 CR 708 (JPO)
4                                           Bail Hearing

5   RUSS GERSON

6                   Defendant
    ------------------------------x
7
                                            New York, N.Y.
8                                           August 30, 2019
                                            11:30 a.m.
9

10  Before:

11                      HON. J. PAUL OETKEN
                                            District Judge
12

13                      APPEARANCES

14  GEOFFREY S. BERMAN
         United States Attorney for the
15       Southern District of New York
    DANIEL NESSIM
16       Assistant United States Attorney

17  FEDERAL DEFENDERS OF NEW YORK INC.
         Attorneys  for Defendant
18  CHRISTOPHER FLOOD

19  ARIEL WERNER

20  ALSO PRESENT:  Lea Harmon, PTSO (SDNY)
                   Matthew Sowa, FBI
21

22

23

24

25

J8UQgerH

| | |
|---|---|
| 1 | (Case called) |
| 2 | DEPUTY CLERK:  Starting with the government, Counsel, |
| 3 | please state your name for the record. |
| 4 | MR. NESSIM:  Good morning, your Honor. |
| 5 | Daniel Nessim for the government.  Joining me at |
| 6 | counsel table is Special Agent Matthew Sowa of the FBI and |
| 7 | Pretrial Services Officer Lea Harmon. |
| 8 | THE COURT:  Good morning. |
| 9 | MR. FLOOD:  Good morning, your Honor.  Christopher |
| 10 | Flood, Federal Defenders on behalf of Mr. Gerson, standing up |
| 11 | for Ms. Gatto.  Also at counsel table with Mr. Gerson is Ms. |
| 12 | Ariel Werner, our newest Federal Defender. |
| 13 | THE COURT:  Good morning. |
| 14 | Good morning everyone.  This is, I guess, a bail |
| 15 | matter.  I'm going to give you a chance to fill in any details, |
| 16 | but the state of play, as I understand it, is that on Friday, |
| 17 | August 23, Ms. Gatto of the Federal Defenders, filed on ECF a |
| 18 | letter requesting permission for Mr. Gerson to travel to London |
| 19 | on August 25. |
| 20 | I did not act on it.  I was actually out of the |
| 21 | country until Wednesday night of this week, but I've been in |
| 22 | contact with my chambers about this.  Then on Tuesday, the |
| 23 | 27th, there was a follow-up letter from Ms. Gatto, defense |
| 24 | counsel, requesting a bail modification for Mr. Gerson to |
| 25 | travel on August 27, the date of the letter, and it said that |

J8UQgerH

1     the government took no position on the request.

2              There was a subsequent letter from the government

3     stating that it changed its mind, and it determined that it

4     would object, and then shortly thereafter, I think, or around

5     that time, pretrial services, as well as the government,

6     realized that Mr. Gerson had actually left for London on

7     August 25.  And, therefore, the issue of an arrest warrant as

8     opposed to possibly scheduling a bail hearing was raised, and I

9     was considering it.  And then the government went to Judge

10    Woods, who was the Part One judge, because I believe I was in

11    flight on Wednesday evening when this was playing out, and got

12    an arrest warrant for Mr. Gerson.

13             I will start with you, Mr. Nessim, if you'd like to

14    fill in any other information I need to know in terms of where

15    we stand now.

16             MR. NESSIM:  I believe that's all -- that's the most

17    relevant information, your Honor.  The defendant was arrested

18    yesterday afternoon when he arrived at JFK on his return flight

19    and was brought to the courthouse after that.

20             THE COURT:  OK.  So was he in custody of the marshals

21    last night or --

22             MR. NESSIM:  He was lodged overnight at the MCC for

23    safekeeping and was picked up this morning by the agents and

24    brought to court.

25             THE COURT:  I understand there was something with a

J8UQgerH

1   drug issue, or not?

2           MR. NESSIM:  So we haven't been able to get more

3   information on that.  As far as we understand it, there was no

4   positive drug test.

5           THE COURT:  I got a message through my deputy that

6   there was a positive drug test.

7           MR. NESSIM:  So, we've tried to follow up on that, and

8   we haven't been able to figure that out.  As far as we know,

9   there was no positive test.

10           THE COURT:  OK.  So what's your position as of now?

11           MR. NESSIM:  We are seeking to have the defendant's

12   bail revoked.  He has been sentenced.  He had a surrender date

13   about six weeks out.  Given that this is post -- you know, post

14   sentence, post conviction, the standard has now shifted, and

15   it's on the defendant to show by clear and convincing evidence

16   that he is not a flight risk.

17           He did return here.  We are not pretending that didn't

18   happen.  However, to travel internationally without court

19   approval that's been a requirement at the outset, and the ease

20   at which he did that, and the risk of that being repeated, is

21   something we take very seriously.  Although at point our

22   position was we take no position on the travel, we did change

23   our position, and it's sort of beside the point.  He needs

24   Court permission to travel internationally.  He didn't receive

25   it.  He traveled, nevertheless.

J8UQgerH

1      THE COURT:  Why did the government change its

2  position?

3      MR. NESSIM:  Travel has been a big part of this case.

4  The defendant traveled internationally routinely.  We thought

5  more carefully about it, and given the pending surrender date,

6  we felt that the flight risk was heightened.

7      THE COURT:  So it wasn't as a result of learning that

8  he had actually left.

9      MR. NESSIM:  We changed our position before we learned

10 that he had left.  We put that letter in, and then shortly

11 thereafter learned from pretrial that he left the country.

12 Also, I note that pretrial filed a violation memorandum.  And

13 in addition to the unauthorized travel, the defendant has not

14 been reporting to pretrial services as required for some time.

15 You know, it would not be something that would necessarily

16 require filing a violation memorandum in its on, but in

17 conjunction with this unauthorized travel, we take these

18 offenses very seriously, and we don't think the defendant can

19 satisfy the standard that he's not a flight risk.

20     THE COURT:  First, I will ask Ms. Harmon if there's

21 anything you'd like to add.

22     MS. HARMON:  No, your Honor.  I don't have any

23 additional information.

24     THE COURT:  Thank you.

25     Mr. Flood.

J8UQgerH

1          MR. FLOOD:  Thank you, your Honor.  This is a

2     misunderstanding.  As the government noted, the travel request

3     had been routine.  I was going back through the docket, and I

4     lost count.  It's somewhere close to 20 if not more, often

5     filed in the same kind of time frame.  And the man is not a

6     flight risk.  He returned, as stated, to the United States.  He

7     was arrested coming off of the plane.  He was granted a

8     surrender date by the Court for reasons that the Court knows.

9     He has been compliant with everything.

10          This is the first we've heard about not reporting, but

11     when I was going back through the docket, I saw that he was

12     supposed to report by internet.  I'm not sure exactly what the

13     release conditions are because I'm standing in for Ms. Gatto,

14     but it is very difficult to understand how somebody can

15     demonstrate they're not a flight risk more than him just acting

16     as he had been routinely doing.  He has business

17     internationally.  He travels to the United Kingdom.  He

18     traveled to places like Pakistan and the United Arab Emirates

19     that do not have extradition agreements with the United States.

20     I understand the government's suspicion, but that's all it is.

21     And, frankly, there is a problem with communication here that

22     falls on our office.

23          THE COURT:  Well, that's what I -- I wish Ms. Gatto

24     were here, and I am tempted to ask why she is not.

25          MR. FLOOD:  I can explain.

J8UQgerH

1              THE COURT:  OK.

2              MR. FLOOD:  Because it goes to what happened here.

3    She got a verdict in a trial that she's been in, in front of

4    Judge Abrams, last night, an acquittal.  But I have observed--

5              THE COURT:  Is it relevant that it was an acquittal?

6              MR. FLOOD:  That was informative.  But I have observed

7    Ms. Gatto myself and the trial team all hours of the night

8    working on that trial, and it appears that Mr. Gerson's

9    communications with Ms. Gatto were not forwarded to the Court

10   in a timely way, as they normally would be.  But after 19 other

11   times where it had been routine for him to expect that it had

12   been granted, it's not -- does not indicate anything like a

13   flight risk here.  It's just someone acting in the normal

14   course.  We understand that it's a different scenario post

15   sentencing, but the evidence is clear that he is not a flight

16   risk.

17             And the fact of the matter is the surrender date has

18   allowed him to continue his business to get his affairs in

19   order.  He has paid his restitution bill because he has been

20   conducting his business.  The reason that someone has a

21   surrender date are to get their affairs in order.  He has a

22   wedding coming up end of October and he has yet to even meet

23   with the BOP because that's not unusual either for a surrender

24   date to understand what that date would be.

25             So when put all together -- and, by the way, the thing

J8UQgerH

1    about the drug test is -- he wasn't even tested for drugs is

2    our understanding.  That is just something that came out of

3    thin air.  He's been compliant in every way.  He was compliant

4    here to the best of his understanding.

5          THE COURT:  Well, so what was the situation when he

6    left on Sunday?  I just don't understand.  If he sort of left

7    assuming that he had permission or if he left without bothering

8    to check with Ms. Gatto as to whether the order had been

9    signed.

10         MR. FLOOD:  I think he assumed that he had permission,

11   and the details of the communication with Ms. Gatto, frankly, I

12   haven't been able to communicate with her about this because

13   she's --

14         THE COURT:  What is she celebrating or something?

15         MR. FLOOD:  Taking a well-earned day of rest after a

16   very intense trial.  And when I say it falls on us, I don't

17   have the details about what communications came in and when,

18   but the fact of the matter is there were two motions filed in

19   the normal course.  I don't know why there's one two days

20   later.  I think he might have changed his travel plans again,

21   but I don't know.

22         But at the end of the day it is not unreas -- to the

23   extent there is a question of scienter, it is at best

24   negligence.  But with past patterns of the government not

25   opposing and the Court's granting, that is all that took place

J8UQgerH

1    here, and it is a misunderstanding.  It does not indicate a

2    flight risk or any kind of conduct or thinking that would meet

3    the standards for having him being detained.

4         It is a two-month sentence.  And the point of having a

5    surrender date to get stuff in order for that two-month

6    sentence, to have him begin it now is actually worse than if he

7    had been put in on the day of sentencing because one would be

8    prepared to go in that day.  Instead -- and I can convey to the

9    Court, Mr. Gerson was shocked when he got arrested because he

10   didn't understand what had happened had actually happened.

11        THE COURT:  But wasn't Ms. Gatto getting ahold of him

12   on the 28th and 29th when he realized --

13        MR. FLOOD:  Sorry.  Say again?

14        THE COURT:  Wasn't Ms. Gatto texting him and emailing

15   him on, whatever, the 26th, 27th when she realized that I

16   hadn't signed the order approving?

17        MR. FLOOD:  I don't know.  And it wouldn't surprise me

18   if she hadn't only because I know what prep for trial looks

19   like, and it's absorptive.  One gets totally focused on what's

20   in front of them.

21        THE COURT:  So does he have other international travel

22   plans in the next -- is he still working for the same employer

23   who wrote a letter --

24        MR. FLOOD:  Yes.

25        THE COURT:  -- for sentencing?

J8UQgerH

1          MR. FLOOD:  Yes.

2          THE COURT:  Does he have other international travel

3    between now and the October surrender date?

4          MR. FLOOD:  The wedding of his stepdaughter is in the

5    south of France, but beyond that, I'm not aware of any further

6    international travel.  And the notion that he would flee to

7    avoid a two-month sentence that he has worked very hard to

8    prepare to get his affairs in order to serve and risk life as a

9    fugitive for the rest of his life with a bail jumping charge

10   unable to go to any extradition country and identify himself

11   personally in order to avoid eight weeks in prison is just not

12   reasonable.  That's just not what happened.

13         THE COURT:  Is there anything you'd like to add?  The

14   truth is, I understand why you went to the Part 1 judge.  I was

15   probably not going to sign an arrest warrant.  My sense was

16   that he was not -- when the government suggested that he was

17   going to flee, I never really bought that.  I think that

18   there's a concern about taking this case seriously, which I

19   addressed at sentencing and other times, and I think this might

20   be part of that, but I do think there is a communication issue

21   here.  I don't know exactly who's at fault, but I don't think

22   it's ever been an issue of risk of flight.  But you can take a

23   stab at persuading me otherwise if you want.

24         MR. NESSIM:  We understand, your Honor.  Just as a

25   preliminary matter, we went to Part 1 judge because of timing

1    because we wanted to have --

2              THE COURT:  I understand.  I'm not criticizing you for

3    it.

4              MR. NESSIM:  But Mr. Flood raises an interesting point

5    about the second application.  Clearly, Ms. Gatto, trial or

6    not, was aware the first order had not been granted and took

7    the efforts to file a subsequent letter, which suggests that

8    Mr. Gerson not only didn't care to check if the order was

9    filed, but didn't let his attorney know he was actually outside

10   of the country, which I think is sort of a disregard and

11   recklessness which somewhat heightens flight concern here.

12             And in terms of the sentence, I mean, obviously, we

13   hope that no one flees, and sometimes people flee when it's not

14   necessarily something that others would view as reasonable.  I

15   think that Mr. Gerson could probably live a nice life in any

16   number of places outside of the United States to avoid serving

17   an eight-week sentence, as short as that might be, you know,

18   for some other defendants.  So we do take the flight risk

19   seriously.

20             We think what happened here is certainly a violation

21   of his pretrial release and would warrant, you know,

22   considering that he is a flight risk or at least can't prove he

23   is not.  He has a passport in his possession.  He clearly flew

24   out of the country without being stopped.

25             THE COURT:  Why aren't you asking are for the lesser--

J8UQgerH

1   the question is whether there is a combination of conditions

2   that would ensure his appearance.  Why aren't you asking for a

3   lesser sanction of no further travel requests other than

4   perhaps the wedding, which is the reason I set the surrender

5   date when I did, and surrender his passport.

6        MR. NESSIM:  We certainly would be asking for that

7   short of revocation.  But it's not is there no set of

8   conditions.  It's whether he has shown by clear and convincing

9   evidence that he is not likely to flee.  Given the fact that he

10  has left the country without court approval and was

11  successfully able to do that, whether or not he returned, we

12  don't think that that satisfies the clear-and-convincing

13  evidence standard.

14       THE COURT:  OK.  Mr. Flood, why shouldn't I order the

15  passport surrendered?

16       MR. FLOOD:  Well, your Honor, because there's

17  actually-- it's just a mistake.  It doesn't show a change in

18  conduct.  He's been reliably under these conditions and there

19  is an understandable communication breakdown here.  And in our

20  view he hasn't actually done anything to warrant a sanction.

21  Certainly the Court can admonish him.  And this is not the kind

22  of thing that is going to be repeated having had this

23  experience, but if the Court orders that, we understand.

24       THE COURT:  You said he doesn't have any international

25  travel planned at this point?

J8UQgerH

1              MR. FLOOD:  Other than the wedding.  And just now I --

2    from him, of course, he has business ongoing, and there might

3    be a need to travel again before his surrender, so -- I don't

4    know this man's business.  I just met him.  But I look at this

5    record, and I think, you know, it's an understandable mistake.

6    It would be one thing if there was an intention to violate a

7    court order.

8              And just to address Mr. Nessim's point about there

9    being more than one motion.  That reflects Ms. Gatto's efforts.

10   I don't have any information about what communication went on

11   between them, but it is hardly sinister.  And if he was to do

12   that, why return, right?  Which he did.  So I think all of the

13   evidence points to that he just made a mistake.  Mistakes do

14   happen, and that doesn't warrant a change of bail condition.

15             THE COURT:  Ms. Harmon, anything you'd like to chip

16   in?

17             MS. HARMON:  Naturally, I think I would disagree with

18   defense counsel, and if you were to continue the defendant on

19   bail, I would suggest that he did surrender his passport.

20             THE COURT:  So if he surrendered his passport, but I

21   specifically allowed the travel for purposes of the wedding,

22   the family wedding, that wouldn't be something that would be

23   difficult to accommodate?

24             MS. HARMON:  No.  As mr. Gerson knows, because we did

25   it several times, once you sign the order allowing him to

J8UQgerH

1    travel, then we arrange for him to pick the passport up from

2    our office, and then he returns the passport upon return.

3                MR. FLOOD:  We don't object to that.

4                THE COURT:  OK.  All right.

5                Given all the circumstances, which include the fact

6    that there have been many bail modification orders allowing

7    international travel, some of them have been very last minute,

8    like this, and it's unfortunate.  And maybe I have been too

9    lenient.  There are a lot of judges who wouldn't have allowed

10   any of them, and maybe I've learned from this that I shouldn't

11   be so lenient about these things.

12               In any event, that is part of the context here.  I'm

13   not persuaded that this shows a risk of flight.  I do find by

14   clear and convincing evidence that the defendant is not a risk

15   of flight.  However, I am concerned about the general following

16   of the rules; and based on those considerations, I am going to

17   require -- the one change I'm going to make to the bail is

18   require the surrender of the passport.  And I will allow the

19   travel for the purpose of the family wedding.  Please make sure

20   that you give notice of the dates at least two days in advance

21   so that -- well, hopefully even more than that, so I can make

22   sure that the order is signed and give enough time for

23   Ms. Harmon to return the passport.

24               I just want to emphasize that I don't really know how

25   much of this was Mr. Gerson or Ms. Gatto being busy with trial

J8UQgerH

1    or whatever, but, you know, it's a federal case, there's a

2    sentence coming up, there's a conviction here, and the rules

3    have to be taken seriously and followed, and that's why I'm

4    making this change.

5              Anything else?

6              MR. NESSIM:  No.  Thank you, your Honor.

7              MR. FLOOD:  Thank you.

8              THE COURT:  Thank you very much.  We're adjourned.

9              (Adjourned)